[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff brings this action against the defendant for sexual abuse over a period of several years. She claims the abuse began when she was ten years of age and continued until she was fifteen.
As a result of this abuse, she claims physical, emotional and psychological pain, suffering and distress and an inability to carry on and enjoy life's activities as well as the requirement for future medical and psychological care and treatment.
 FACTS
Plaintiff's Case
The plaintiff, Karma Smith, was born on June 25, 1969 and at the time of trial she was thirty-one years old. Her father left her mother, Sandra Rucker, before she was born. Rucker worked at Electric Boat for twenty-eight years. She suffered a stroke when the plaintiff was in kindergarten and another when the plaintiff was ten years old. Defendant, Darryl Scott, was a friend of Rucker. He was twenty-four years of age when Rucker allowed him to move into her apartment with her and Smith. Because of her illness, she welcomed his help in caring for Smith and driving her to dance class and school. CT Page 7938
Smith looked upon Scott as an older brother and father figure. At first he was a good friend because he was nice to her and paid attention to her. Up until she was eleven years old she was an excellent student, very active in sports, basketball, soccer and cheerleading. She also took dancing. At this time, she received the President's physical fitness award.
Things then changed dramatically. Scott forced her to let him perform oral sex upon her. She was scared and frozen. This event occurred shortly before her eleventh birthday. During her eleventh year, he had intercourse with her several times, in her bed, in his and in his car. He made her feel dirty and used. He told her she was his little girl and had her call him "Dad". After age twelve, they had sex several times a week. She then became pregnant. Her mother blamed her. She felt totally betrayed and alienated from her mother. She was forced by Rucker and Scott to have an abortion. Scott had never admitted to Rucker that he had gotten her pregnant. She was treated by Dr. Robert Crootof, an OB-GYN doctor in Norwich. After the abortion, Scott continued to have sex with her until at the age of thirteen she was again made pregnant by him. She suffered a spontaneous abortion. At age fourteen, Scott made her pregnant again and she gave birth to a child.
At age thirteen, Scott slapped her face and sodomized her to punish her for telling a girlfriend that she was pregnant. He refused to stop at her request and continued until he felt she had learned a lesson. She found the sodomy very painful. When the plaintiff was fourteen, she was infected with gonorrhea, herpes and chlamydia by Scott. She was also made pregnant by him during her fourteenth year resulting in the birth of a daughter, Michele Scott, March 20, 1985. Scott stipulated during trial that he was the father. Smith also gave birth to Kassondra after reaching age sixteen, also acknowledged by Scott as the father. As a result of all these problems, Smith dropped out of school when she was fifteen years of age.
Scott originally deceived Smith's mother about the cause of her pregnancy. He later admitted it to her and promised not to do it again. In fact, without the mother's knowledge, he continued to have sex with Smith for several years, resulting in another abortion and three pregnancies resulting in births.
The following is a report of Robert E. Crootof, OB-GYN (Plaintiff's Exhibit 4).
"I first treated Karma in the Emergency Room of William W. Backus Hospital on June 9th of 1982, for bleeding and retained tissue after an CT Page 7939 abortion at Planned Parenthood on June 3rd. The visit involved a repeat suction curettage.
Over the last 19 years Ms. Smith has been followed through this office and under our supervision at Planned Parenthood, for another abortion in 1983, and for the birth of her first child in March of 1985 at the age of 15. In 1986, at the age of 16, the patient tested positive for sexually transmitted diseases, both gonorrhea and chlamydia. She has been treated additionally for sexually transmitted diseases since that time.
She had her second child in May of 1987 at the age of 17, through the clinic at Lawrence and Memorial Hospital. She had another abortion and miscarriage in 1989, 1990 and in 1991, through our office, had her third and last child, delivered by Cesarean section because of cephalopelvic dysproportion. She had a concurrent tubal ligation at that time.
In the late 1980's, she had first begun to complain of dyspareunia and pelvic pain. She was treated with antibiotics on several other occasions. In January, 1992, she had a diagnostic and laser laparscopy for lesions that appeared to be endometriosis, but that was unsuccessful at ameliorating her pain and in March of 1992, at the age of 22, she had a total abdominal hysterectomy and bilateral salpingo-oophorectomy. She has been on hormone replacement since that time.
At the time of her hysterectomy she was found to have adenomyosis of the uterus, a form of endometriosis, but the pathology report also revealed tubo-ovarian adhesions which very likely came from old infectious diseases, probably sexually transmitted, that had been diagnosed and treated when she was a teenager.
In my 30 years as an obstetrician/gynecologist, I have seen only one patient who was pregnant at an earlier age than Ms. Smith. I cannot recall having treated more than one or two other 12 year old pregnant patients. Clearly her sexual activity commenced at an extremely early and inappropriate age. My training and practice have included a large number of socially and economically disadvantaged patients in the New Haven, Oakland, California and Norwich areas. Even without considering the psychological damage inflicted by sexual activity including intercourse, at a pre-teen age, the physical toll of early pregnancy, teenage infections with sexually transmitted diseases which are known to cause long-term sequelae such as pelvic inflammatory disease with symptoms she subsequently reported such as dyspareunia and dysmenorhea and pelvic pain, are substantial. I believe they were a substantial factor in leading to the symptoms of which she complained in 1991 and 1992, that eventually led to her hysterectomy and removal of her ovaries. CT Page 7940
Although her dysmenorrhea and dyspareunia could certainly have been attributed to the adenomyosis, the pathology indicating old pelvic inflammatory disease around her ovaries certainly suggests a contributing factor from previous infection clearly documented as a teenager.
I believe this represents a fair summary and explanation of the medical events with which this office has been involved in the treatment of Karma Smith from the age of 12 to the present day."
Ms. Smith also treated with Dr. Daniel Abraham, a psychologist.
Daniel Abrahamson, Ph.D. testified that if Karma Smith did not obtain treatment for Complex Post Traumatic Stress disorder which she experiences as a result of the sexual abuse, she would have a very bleak future. She would continue to have problems with self image, impulsivity and self destructive behavior, disassociation, somatic problems, guilt and feelings of despair and hopelessness (Transcript p. 2). Social withdrawal would continue, and perhaps worsen. Hostile feelings and anger would also continue to effect her (Transcript p. 3).
He indicated that therapy would be important, particularly helpful if by someone who can deal with "this kind of pervasive, complex, post-traumatic stress disorder, and deal with it well, and work with the person over an extended number of years." (Transcript p. 6.) This person would have to be able to anticipate anger and frustration, because "she will get angry and frustrated and leave treatment unless you have a therapist who can anticipate that and work at that . . ." (Transcript pp. 6-7.)
Dr. Abrahamson indicated that she will likely need three sessions per week, for a minimum of five to seven years. Then twice a week after that. "The reason that you'd begin to titrate the person from three days a week to two days a week is, as the person develops more of an ability to maintain a positive sense of themselves a longer period of time, to not fall into some of the thinking reaps that they can get themselves into by having to go an extended period of time without treatment." (Transcript pp. 7-8.)
Dr. Abrahamson indicated that the rate for someone with the necessary skill to perform this type of therapy would cost about one hundred twenty dollars per session ($120) to one hundred fifty ($150). He also indicated that there may be intermittent hospitalizations, partial hospitalizations and medications. (Transcript p. 8.) CT Page 7941
Dr. Abrahamson addressed the diagnostic criteria for Post Traumatic Stress disorder, and indicated that of several criteria listed on Defense Exhibit E, which is from the Diagnostic and Statistical Manual Version 4-TR (2000 version), Karma Smith displays the following: (Transcript pp. 11-13.)
1. Experiencing a traumatic event or events,
2. Intense fear, helplessness or horror,
3. Recurrent or intrusive recollections or distressing dreams,
4. A sense of reliving the event, flashbacks, hallucinations,
5. Psychological distress on exposure to cues that symbolize or resembled the event.
6. Psychological reactivity on exposure to cues that symbolize or resemble the event.
Dr. Crootof treated the plaintiff from age 12 to the present and was there when she underwent a hysterectomy with complete removal of her ovaries and uterus at age 22. His report states that she had tubo-ovarian adhesions which came from old infectious diseases, probably sexually transmitted when she was a teenager. He believed that the sexually transmitted diseases were a substantial factor leading to her hysterectomy.
Dr. Abrahamson stated that the plaintiff would continue to have problems of several kinds and that if she did not obtain treatment for the Complex Post-Traumatic Stress disorder, she would have a bleak future. The psychological harm caused by the sexual abuse at a young age is profound and is global, impairing her entire personality. It will require years of therapy, but the consequences of the Complex Post-Traumatic Stress disorder will affect her for the rest of her life. He also found no other cause for the plaintiff's problems other than the sexual abuse she suffered from the defendant.
Defendant's Case
Scott testified and admitted to oral sex and intercourse with the plaintiff before her thirteenth birthday. He also acknowledged that he caused her to have a pregnancy resulting in an abortion before she was age thirteen and another pregnancy resulting in an abortion a year later. He also acknowledged frequent intercourse and that he is the father of two of the Smith's three children. He denies the sodomy. For CT Page 7942 the most part he did not deny the claims of the plaintiff.
The defendant presented Robert M. Spitz, M.D., OB-Gyn, who reviewed the plaintiff's medical records and claimed that the need for the hysterectomy arose from medical matters unrelated to sexual abuse. He could not say that the hysterectomy was required because of sexually transmitted diseases. The court finds the opinion of Dr. Crootof who treated the plaintiff her entire life to be the more persuasive and credible and finds that the hysterectomy was caused by the sexual abuse by the defendant.
Dr. Kenneth Robson, M.D. (a psychologist) testified for the defendant and opined that the problems of the plaintiff were caused by many factors including genetics. He claimed to have information that the plaintiff's father and mother had been troubled by problems of bipolar disorders and alcoholism. He conceded under cross-examination that there was insufficient evidence in the medical records upon which to develop a reliable profile of the mental health history of either parent. In fact, the plaintiff's mother was a witness before the court and there was no evidence presented that she had any problems with alcohol. The court finds the testimony of Dr. Robson entirely unpersuasive in that he discounts the outrageous sexual abuse as the cause of the plaintiff's problems and tries to blame them dubious genetic factors.
Conclusions re Liability
The court finds the evidence is overwhelming that the defendant sexually abused the plaintiff for several years, from age twelve to fifteen, and beyond. The court also finds the plaintiff's physical problems, especially the hysterectomy were a result of this abuse and proximately caused by it. The court also finds that her psychiatric and psychological problems were also directly caused by the sexual abuse of the defendant.
Damages
Based upon all of the foregoing, the court hereby awards as economic damages, past medical bills in the amount of $4,137.00; future therapy expenses as testified to by Dr. Abrahamson; 5 years of therapy, 3 times per week at $125.00 — $97,500.00; two years thereafter twice per week at $125.00 — $26,000.00. The court does not accept the claim of treatment once a week thereafter for the rest of the plaintiff's life as being too speculative. The court thereafter awards a total of $127,637.00 in economic damages. In addition, because of the many years of sexual abuse and the frequency of it, the court finds that the plaintiff suffered severe physical and mental anguish. She also suffers and continues to suffer from a loss of educational opportunities, CT Page 7943 employment opportunities and a loss of her capacity to develop adult, loving relationships with others. She also testified to other problems too numerous to list here.
Accordingly, the court awards the plaintiff $1,000,000.00 in noneconomic damages. In addition, the court finds that the plaintiff is entitled to punitive damages in the form of legal fees. In accordance with the plaintiff's fee agreement she is entitled to a contingent legal fee based upon the total award of damages, economic damages, $127,637.00 and noneconomic damages $1,000,000.00 for a total of $1,127,637.00. The legal fees awarded are $269,146.00.
Conclusion
It is the judgment of the court that the plaintiff be awarded $127,637.00 in economic damages, $1,000,000.00 in noneconomic damages for a total of $1,127,637.00. In addition, the court awards punitive damages in the amount of $269,146.00, plus costs. The court finds no basis for awarding prejudgment interest. Post judgment interest may be awarded in accordance with the statute. The total judgment is $1,396,783.00. plus costs.